IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE  DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
SNAPCHAT ACCOUNT
LOVINGJUNIOR94 (USER ID 8279F953-
E9EA-4EFE-90C7-AB0977204C77) THAT
IS STORED AT PREMISES CONTROLLED
BY SNAPCHAT, INC.

Case No. ___7:24mj137___

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher M. Cummings, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Snapchat, Inc., an electronic communications service and/or remote computing service provider headquartered at 2772 Donald Douglas Loop North, Santa Monica, California 90405.

2.     The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A) to require Snapchat, Inc., to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

1

3.      I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), currently assigned to Roanoke, Virginia, and have been so employed since November 2003.  Prior to being employed by HSI, I served the Department as a Border Patrol Agent from 2000 until 2003.  In my current capacity as a Special Agent, I am responsible for investigating crimes relating to the sexual exploitation of children, including but not limited to crimes pertaining to the solicitation and enticement, as well as the importation, advertising, possession, access with intent to view, transportation, receipt, and distribution of child pornography in the Western District of Virginia.  My training includes basic, advanced, and on-the-job training in this investigative area.  I am familiar with procedures for obtaining and executing federal search warrants, and I have led and participated in the execution of numerous search and arrest warrants related to child exploitation and other sexual offenses, firearms and narcotics violations, money laundering, and fraud.  I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program, the Immigration and Customs Enforcement (ICE) Special Agent Training program, and the Internet Crimes Against Children (ICAC) Task Force Basic On-Line Investigative Techniques Course.  As a result of this training and experience, I am responsible for enforcing federal criminal statutes involving the sexual exploitation of children.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2422(b) (coercion and enticement of a minor to engage in sexual activity) have been committed by Lenny BALDWIN.  There is also probable cause to search the information described in Attachment A for

evidence, instrumentalities, contraband, and fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      On April 23, 2015, a grand jury in the Western District of Virginia charged BALDWIN (in case number 6:15-CR-7) with sexual exploitation of children, in violation of 18 U.S.C. § 2251(a); coercion and enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b); and transmitting interstate threats with the intent to extort, in violation of 18 U.S.C. § 875(d). Investigation of this case revealed that, beginning in summer 2013, when he was 19 years old, BALDWIN would initiate online communications through various social media accounts in different names, including through Snapchat, with girls under the age of 18 and entice and coerce them into providing him with nude pictures and to have sex with him. For girls under 14, BALDWIN would tell the girls that they needed to keep their interactions "lowkey" because of their age difference.

8.      On October 24, 2016, BALDWIN pleaded guilty, pursuant to a Rule 11(c)(1)(C) plea agreement, to a one-count Information charging him with coercion and enticement, in violation of 18 U.S.C. § 2422(b), and the pending indictment was dismissed. As a part of the plea agreement, the parties agreed to a sentence of a term of imprisonment of 120 months, the

mandatory minimum. On March 8, 2017, in accordance with the plea agreement, BALDWIN was sentenced to 120 months imprisonment and a lifetime term of supervised release.

9.    BALDWIN was released from custody on or about May 10, 2023, and began his term of supervised release.  His conditions of supervised release included the conditions that, without prior permission from his probation officer, he not have any contact with minors (other than incidental contact), including online; that he not utilize any social networking forums; and that he not obtain an internet-connected cell phone.

10.    On January 10, 2024, BALDWIN's probation officer filed a petition for an arrest warrant based on the allegation that BALDWIN had failed to update his sex offender registration address.  Specifically, BALDWIN had been living at an unauthorized address and had failed to update his sex offender registration.  On May 14, 2024, The Honorable Judge Norman K. Moon revoked BALDWIN's supervised release and sentenced BALDWIN to a term of 8 months as a result of his supervised release violation.

11.    In April 2024, I learned that Lenny BALDWIN was reported to have engaged in the enticement of a minor and to have failed to report his correct address as a sex offender, which was a condition of his supervised release.  This tip was reported by a parent of a minor to another law enforcement agency on or about July 24, 2023, mere months after BALDWIN was released from custody.  The reporting party (RP) stated BALDWIN had approached his/her son on numerous occasions at American Eagle located at Valley View Mall in Roanoke, Virginia.  The RP stated BALDWIN approached his/her son on several occasions to "hang out."  The RP further stated he acted "very strange" towards his/her son as well as other minors at the mall and that he/she felt BALDWIN was trying to "groom" them.

12.    In July 2024, I spoke on the telephone with the child of the RP regarding his interactions with BALDWIN.  The child, who is now 18 years old, stated he worked four days a week at American Eagle clothing store at Valley View Mall from April 2023 until February 2024. He stated BALDWIN acted inappropriately toward him on several occasions.  He stated BALDWIN would come in the store regularly when he was working and say sexually inappropriate things.  BALDWIN would buy something at the store so he could talk to the minor while he worked behind the register.  The minor remembered BALDWIN filling out a credit card application while he worked behind the counter.  The minor thought BALDWIN was only filling out the application so he could speak to the minor.  He stated BALDWIN invited him to his hotel room on multiple occasions and stated that other minors would be there.  BALDWIN asked for his phone number on several occasions.  The minor did not provide his phone number to BALDWIN or communicate with him on social media.  He said BALDWIN came in the store several times and would talk about how he was counting down until the minor's eighteenth birthday.  He would say things like: "four more months until your birthday."  The minor believed BALDWIN to be implying that he had to wait until he was no longer a minor and could then have sexual relations with him.  The minor said he gave BALDWIN no reason to think that he had any interest in any form of relationship with BALDWIN.  He reported BALDWIN's unwelcome behavior to the store manager, his parents, and to mall security.

13.    I also learned that on January 3, 2024, the Roanoke City Police Department (RCPD) received a call regarding the enticement of a minor.  An anonymous caller reported that a 16-year-old minor (identified as MV1) was brought to Carilion Roanoke by police due to him making suicidal comments to his mother.  The caller reported that MV1 disclosed while being evaluated

that his mother allowed a registered sex offender (BALDWIN)[1] to live in their basement for a few weeks until December 16, 2023.[2]  The caller stated BALDWIN had just gotten out of jail after serving 8 years.  They stated he eventually made friends with the mother and moved in because he had nowhere to go.  The caller stated that there were suggestive text messages from BALDWIN to MV1 on MV1's phone.  The caller said MV1 took screenshots of the text messages.  The caller stated the text messages contained statements like, "I don't know if you can take these 10 inches," and "can you handle it."  According to the caller, BALDWIN told MV1 to delete the messages so no one would see them.  MV1's mother also told the caller that BALDWIN had touched the child's leg.  During this encounter with MV1, RCPD consensually retrieved data from MV1's cell phone.  This data included approximately 40 screenshots of text messages between MV1 and BALDWIN that MV1 had taken in October 2023 and December 2023.  BALDWIN's messages were sent using two different phone numbers, (540) 817-0203 and (540) 308-9597.

14.    I have reviewed the screenshots of text messages exchanged between BALDWIN and MV1.  The October 2023 screenshots include the following messages sent by BALDWIN (on the left side) using (540) 817-0203 and by MV1 (on the right side in blue):



---

[1] It is unclear whether MV1 specifically identified BALDWIN by name or whether the caller later was able to identify the person MV1 described as being BALDWIN.

[2] This was the unauthorized address that was the basis for BALDWIN's supervised release violation.









8





15.     Notably, in the second and fourth screenshots, BALDWIN "unsends" some of his salacious messages, which would effectively delete them from MV1's phone had MV1 not already screenshotted them.

16.     The December 2023 screenshots include the following messages sent by BALDWIN (on the left side) using (540) 817-0203 and by MV1 (on the right side in blue):







17.    Notably, in the second and third screenshots, BALDWIN "unsends" several messages, some of which were not recovered from MV1's phone.

18.    The December 2023 screenshots also include the following messages sent by BALDWIN (on the left side) using (540) 308-9597, and by MV1 (on the right side in green):







19.    On or about January 10, 2024, a RCPD detective interviewed BALDWIN about his interactions with MV1.  BALDWIN denied sending anything inappropriate to MV1.  BALDWIN also provided two different phone numbers at which he said he could be reached, although neither phone number was one of the phone numbers that BALDWIN used to text MV1.

20.    In August 2024, I spoke with MV1 regarding BALDWIN.  He told me they met when they worked together at Dollar Tree in late summer of 2023 in Roanoke, Virginia. BALDWIN had several different phones and phone numbers while they were around each other. BALDWIN said he needed to keep switching phone numbers because "his PO was after him." Another detective and I showed MV1 approximately 20 different screenshots of text messages between MV1 and BALDWIN, including the messages shown above.  MV1 acknowledged that each of the text messages were between him and BALDWIN.  MV1 specified where he understood BALDWIN to be asking if MV1 would date BALDWIN.  MV1 told me that he had no interest in

12

BALDWIN in that way.  MV1 pointed out where BALDWIN had unsent certain messages because BALDWIN knew he could get in trouble for attempting to entice MV1 in a sexual way.  MV1 recalled another text message where BALDWIN told MV1 that "he had a cute smile."  This message was captured by MV1 in a December 2023 screenshot:



21.    MV1 recalled that BALDWIN texted him that message while he and BALDWIN and MV1's mother were sitting on the front porch together.  MV1 recalls laughing about something and then immediately receiving a text from BALDWIN.

22.    MV1 also recalled sexual statements BALDWIN had verbally made toward him to include "I've had eyes on you since I met you," "when is it going to be me and you?," "you'll understand when you're older," "can you take all 10 inches?," and "are you going to try it with me."  MV1 felt that BALDWIN would laugh at anything MV1 said and took it to be BALDWIN acting in a flirtatious manner towards him.  Sometimes BALDWIN would laugh and touch MV1's arm.  He told MV1 that he liked him and he wanted to date him.  MV1 made it clear that MV1 was "100%" straight" and did not want to date BALDWIN.  MV1 explained and pointed out in several text messages that BALDWIN asked MV1 to keep their communications a secret and delete any text messages that BALDWIN sent MV1 that were sexual in nature.  MV1 further explained how

BALDWIN wanted access to monitor MV1's blood sugar level (MV1 is diabetic).  MV1 felt that BALDWIN was trying to obtain some type of control over him and felt it was strange.

23.    MV1 recalled that BALDWIN showed him adult pornography on at least four or five occasions.  BALDWIN would call him over and then surprise him by showing it to him.  BALDWIN also told MV1 that he was going to show the pornography to MV1's younger brother.  BALDWIN asked for MV1's Snapchat almost every week.  This is why MV1 only texted with BALDWIN.  He did not want BALDWIN contacting him on any of his social media accounts.  He said BALDWIN would try almost every other week to get his social media profiles.

24.    MV1 also recalled when BALDWIN attempted to kiss him while MV1 was sitting in a vehicle.  BALDWIN leaned in through the car window outside of Dollar Tree, and MV1 pushed him away.  MV1 also recalled a time when they were sitting in the car together, and BALDWIN put his hand on MV1's thigh, and MV1 "smacked" BALDWIN's hand away.  MV1 said that BALDWIN said, "I see how it is" and got out of the car.

25.    MV1 stated that he remembered BALDWIN using at least two different cell phones, to include a Samsung A13 and an iPhone 13.  MV1 said someone got the Samsung for BALDWIN and that MV1's mom allowed BALDWIN to use MV1's deceased dad's iPhone 13.  BALDWIN was not permitted to use these smartphones without permission from his probation officer.  However, I have spoken with his probation officer, and BALDWIN did not have approval to use these devices.

26.    I also interviewed MV1's younger brother (who is currently in 11th grade), identified as MV2.  MV2 said BALDWIN made some sexual advances toward him but made more sexual advances toward MV1.  MV2 recalled BALDWIN asking MV2 if "he could take it."  At one point BALDWIN texted MV2 at 2:00 or 3:00 am and asked for a picture of MV2's "ass."

BALDWIN later asked MV2 to delete the text. MV2 responded by stating "no, that is borderline child pornography."

27.    On August 23, 2024, a summons was issued to Snapchat, Inc., related to any accounts associated with phone numbers (540) 817-0203 and 540-308-9597. These phone numbers were identified as the numbers used to text with MV1 on the captured screenshots. On August 29, 2024, Snapchat, Inc. provided HSI with the following, among other information: Phone number (540) 817-0203 was verified by the owner and used to create Snapchat user ID 8279F953-E9EA-4EFE-90C7-AB0977204C77 with username lovingjunior94. This account was created on or about November 15, 2023, and had log-in activity until on or about January 10, 2024, which was the date BALDWIN was arrested on state failure-to-register charges. BALDWIN's probation officer did not give BALDWIN permission to create a Snapchat account.

## BACKGROUND CONCERNING SNAPCHAT

28.    Through training and discussions with other law enforcement officers who have had interactions with Snapchat and from reviewing the Snapchat Law Enforcement Guide (published by Snapchat), I know the following:

    a.    Snapchat is a mobile application made by Snap, Inc. and available through the iPhone App store and Google Play Store. The Snapchat app provides users a way to share moments with photographs, videos, and chats.

    b.    Basic subscriber information is collected when a user creates a new Snapchat account, alters information later, or otherwise interacts with the service. Not all listed information is required, and user-provided subscriber information is not always independently verified by Snapchat. Basic subscriber information may include: Snapchat

username, email address, phone number, Snapchat account creation date, and timestamp and IP address of account logins and logouts.

      c.     A Snapchat user identification number is a unique identifier associated with a specific Snapchat account, and it cannot be changed by the user. A Snapchat username is a unique identifier associated with a specific Snapchat account that can be changed by the user once a year. At this time, a user can only change the username to one that has not been previously owned by anyone else. A display name, on the other hand, is not a unique identifier and can be created and changed by a user to indicate how the user will appear within the app. A user can also change a friend's display name to determine how that friend will appear to that particular user on the app, similar to how one can customize contact names on a smartphone.

      d.     Snapchat retains basic subscriber information. This information is entered by a user in creating an account and is maintained as long as the user has not edited the information or removed the information from the account. Once the user makes a change, the previously existing information is overwritten. Upon receipt of a preservation request, however, Snapchat can capture the user information available at the time; and future actions by the user will not affect the preserved user information. Snapchat also retains logs containing IP address associated with account login and logout for a limited period of time after the user has deleted his or her Snapchat account.

      e.     Snapchat retains logs of previous messages, also referred to as "Snaps," sent and received. Snaps are photographs or videos taken using the Snapchat app's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story or Chat.

f.      In certain limited circumstances it may be possible for Snapchat to retrieve the content of sent messages.  Snapchat deletes each Snap from its servers once all recipients have viewed it, therefore Snapchat will not be able to retrieve all message content.  When a Snap remains unopened, it will be deleted 30 days after it was sent.

g.      Snapchat retains logs of previous Snaps and may, under certain limited circumstances, store the content of users' unopened Snaps.

h.      A user can add Snaps to their "Story."  A Story is a collection of Snaps displayed in chronological order.  Users can manage their privacy settings so that their Story can be viewed by all Snapchatters, their friends, or a custom audience.  A user can also submit their Snaps to our crowd-sourced service "Our Story," which enables their Snaps to be viewed by all Snapchatters in Search and Snap Map.

i.      Memories is Snapchat's cloud-storage service.  Users can save their sent or unsent Snaps, posted Stories, and photographs and videos from their phone's photo gallery in Memories.  Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user. Users may encrypt their content in Memories until deleted by the user.  Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot by decrypted by Snap.

j.      A user can type messages and send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature.  Snapchat servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen.

k.      If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the

user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection.

l.      A preservation is a snapshot in time of a user's data, including basic subscriber information, metadata (usage logs) and content (Chats, Snaps, Stories, and Memories).  Upon receiving a signed and dated preservation request, Snapchat will attempt to preserve available account information associated with any properly identified Snapchat users in an offline file for up to 90 days.

m.      Snapchat honors requests from law enforcement to preserve information in accordance with 18 U.S.C. 2703(f) and will provide such information to law enforcement pursuant to a court order or a federal or state search warrant.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

29.      I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A), by using the warrant to require Snapchat  to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

30.      In May 2023, BALDWIN was released from federal prison after serving a sentence for coercing and enticing a minor in the Western District of Virginia.  Within a few months of his release, BALDWIN began engaging in inappropriate and sexually explicit advances of minors in Roanoke, Virginia.  There is probable cause to believe that BALDWIN sent sexual text messages and made physical advances amounting to the coercion and enticement of a minor.  BALDWIN

additionally sought to obtain MV1's Snapchat for the purpose of engaging in additional coercive and enticing behavior. And there is probable cause to believe that BALDWIN registered a Snapchat account in November 2023 using the same number that he was texting MV1 in October 2023 despite being prohibited from doing so by his conditions of supervised release. I believe there is probable cause that BALDWIN's social media accounts will contain evidence of the coercion and enticement of minors to engage in sexual activity.

31.    Based on the foregoing, I request that the Court issue the proposed search warrant.

32.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Snapchat. Because the warrant will be served on Snapchat, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

CHRISTOPHER M CUMMINGS
Digitally signed by CHRISTOPHER M CUMMINGS
Date: 2024.09.09 08:14:32 -04'00'

Christopher M. Cummings
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on ___September 9___, 202_4_

_____
Honorable C. Kailani Memmer
UNITED STATES MAGISTRATE JUDGE